160 So. 702

**PATERSON v. JORDAN et al.**

I Div. 838.

Supreme Court of Alabama.

Jan. 24, 1935.

Rehearing Denied April 4, 1935.

Further Rehearing Denied April 25, 1935.

Jesse F. Hogan, of Mobile, for appellant.

300

Adams & Gillmore, of Grove Hill, for appellees.

FOSTER, Justice.

The material facts which are important for the purposes of this suit are, in substance, as follows: Appellant claims the land under a mortgage foreclosure sale by her as one of the assignees of a mortgage executed and duly recorded by Davis Bluff Land & Timber Company, dated February 11, 1918, to People's Bank of Mobile. The assignment was made September 9, 1922, to appellant and Mrs. Edey. The foreclosure sale was had on the 18th day of April, 1932. Appellees claim the land under an execution sale on a judgment in their favor against the Davis Bluff Land & Timber Company, the mortgagor above mentioned. The judgment was rendered March 23, 1926, and execution issued June 21, 1932, by sale effected July 25, 1932.

The rights of the parties depend upon whether the facts, not materially disputed in many respects, show that the mortgage was satisfied by the transactions disclosed in the evidence.

The Paterson & Edey Lumber Company paid the bank the mortgage debt, and caused the notes and mortgage to be assigned to Mrs. Paterson and Mrs. Edey, wives of the two principal officers of the company. The consideration was a debt due by the company to their husbands, respectively, which they assigned to their wives. The notes were past due when they were assigned. The transaction was the same as though the bank had assigned to the Paterson & Edey Lumber Company, and it had in turn assigned to the wives of the two principal officers; all after maturity. They therefore took the mortgage burdened with the duties and obligations of the company which was in reality their assignor. So that whether the notes were paid by the company when the bank received its money or whether it was a purchase of the notes by the company for the benefit of Mrs. Paterson and Mrs. Edey depends upon whether the Paterson & Edey Lumber Company was then, or thereafter became, by a contract which had been made, the principal debtor as respects the mortgagor, the Davis Bluff Land & Timber Company. The land seems to have been chiefly valuable for its timber. After the Davis Bluff Land & Timber Company executed the mortgage to the People's Bank, it sold the timber to Anders Bros., who were mill men. Anders Bros. then agreed with Paterson & Edey Lumber Company, who were lumber dealers, to manufacture the timber into lumber and sell it to them. The three, Davis Bluff Land & Timber Company, called the sellers, Anders Bros., the buyers, and Paterson & Edey Lumber Company, the company, all joined in a tripartite contract in December, 1918. We will state only such part of that contract as seems to affect this question.

Anders Bros., called the buyers, as a part of the purchase price assumed and agreed to pay (as the principal debtor) the balance of the mortgage debt then unpaid, $25,000 and to pay the sellers an additional sum of $12,500, evidenced by notes due in installments. The buyers agreed to cut and manufacture the timber into lumber to be sold to the company by contemporaneous separate agreement. The company agreed that upon receipt of the lumber it would deposit in a certain bank as a trust fund $7.50 per thousand feet to be applied on the mortgage notes to the People's Bank, and on the purchase-money notes to the sellers, without preference or priority, one over the other; but in the order

of their respective maturity. This obligation was conditioned only on the delivery of lumber to be cut, but did not apply to that then on hand, and expressly excluded all other liability. The buyers and the company then made a separate "cutting" agreement, so called. The buyers (called in that instrument the manufacturers) sold to the company the timber which they had purchased from the sellers, and agreed to log and manufacture it as directed by the company and for it. The company advanced $15,000 in cash, and accepted drafts, to or for the manufacturers, agreed to make the trust deposit $7.50 per thousand feet to be applied as stated in the tripartite agreement. The price of the lumber for which the company was to account was to be the amount realized by the company on sales made by it less 12 per cent. and all expense of selling. As against the price, the company agreed to make certain advances when the lumber should be stacked at certain locations.

The company also reserved the right to pay any accounts for expenses of logging and manufacturing incurred by the manufacturers and unpaid by them, and to deduct the same from the advances to be made under the contract. When the company made sales, it should by the cutting contract deduct 12 per cent. for itself, and expenses and commissions on sales, and the balance was to be used (1) by making the trust deposit of $7.50 per thousand feet; (2) repaying to the company the amounts agreed to be advanced, (3) expenses incurred by the manufacturers, but unpaid by them and paid by the company; and (4) any other indebtedness of the manufacturers to the company. The sellers were not parties to this agreement. But, by the tripartite agreement, the first and primary obligation assumed by the company on delivery of the lumber was to set up the trust fund of $7.50 per thousand feet.

For a short time the contract was carried out as contemplated, except that there does not appear to have been any lumber on hand as stipulated in the contract. Then there was delay in manufacturing and supplying the lumber to the company, so that the $7.50 per thousand feet was not enough to meet the notes to the bank and to the sellers as they fell due. And the manufacturers needed and received from the company more than it had agreed to advance. The bank began to press the company; so did the sellers. The company had not theretofore agreed definitely to guarantee payment to either of them.

The buyers then also had a chance to lease the turpentine rights in the timber with the consent of the company, and the bank agreed to it at the request of the company, upon condition that the company would obligate itself to pay the notes to the bank. That agreement was then verbally made between the company and the bank; the sellers not being a party to it. But the sellers insisted upon payment of the notes to them also. There was a verbal agreement between the three (the company, the sellers, and buyers), in substance, that the company should retain the $7.50 trust fund on future deliveries, and. since it would probably not be enough to pay the notes as they matured, the company would pay them to the sellers, and at least one note to the bank in anticipation of the fund to be created upon such deliveries. The trustee bank had gone into liquidation; but the company became obligated in respect to all the notes and undertook to and did pay them in advance of a sufficiency of the trust fund out of which they were to be paid. But the company did not become the principal debtor as respects either set of notes, except as the so-called trust fund in contemplation should be sufficient to that end. Anders Bros., the buyers, had assumed the primary liability for the payment of them all. As between the company, the buyers, and sellers, the company was secondarily liable as guarantors, except as the trust fund should be sufficient.

There was no contract by which the sellers could contend that, so far as they were concerned, the company was at all events substituted for them as principal debtors to the bank on the mortgage, but only to the extent of the amount of the proposed trust fund.

But by the tripartite agreement the company obligated itself to create a trust fund of a definite sum of $7.50 per thousand feet of lumber or timber delivered to it. That duty to the sellers (mortgagors) took precedence under that agreement over any right to deduct anything for advances or otherwise from the price realized, and regardless of sales or price. True, the buyers became largely indebted to the company for advances made. But those advances stand behind the $7.50 trust fund, under the tripartite agreement, so far as concerned the sellers. So that the company only obligated itself to become primarily liable to the extent that the fund it obligated itself to set up was sufficient.

We are here concerned with the status of the company in respect to the sellers as mort-

gagors. For, if the circumstances occurred which by the contract imposed on the company the primary duty to the sellers to pay the bank notes executed by the sellers, secured by their mortgage, when the company paid those notes and had them transferred to Mrs. Paterson and Mrs. Edey, the mortgage was thereby discharged as against the sellers, in any controversy between the company or its assignees and the sellers and those succeeding to their rights. The status of the relations between the company and the buyers is another question. It had various other securities executed by the buyers.

We are remitted, therefore, to the question of fact whether the lumber on which the trust fund was due to be measured was sufficient to set up an amount enough to pay the notes to the bank secured by the mortgage, $25,000, and the notes of the buyers to the sellers, $12,500.

There was no attempt to modify the amount of the so-called trust for about two years. Then the company and the buyers, without the participation of the sellers, agreed that the buyers might sell the lumber products to others than the company, provided the company was paid $3 per thousand. The buyers were largely indebted to the company for advances. The $3 per thousand was placed to the credit of the buyers on their general account. There was no trust fund set up on the books of the company.

It does not appear that the sellers agreed to any arrangement about crediting the moneys received by the company. Figured upon the basis of $7.50 per thousand feet before the agreement with the buyers changing it to $3, and thereafter at $3, one phase of the evidence tends to show that the company and their successors in interest received enough to provide for payment of the $25,000 to the bank, and $12,500 to the sellers, though the latter may not be bound to abide by the reduced amount, and certainly so if it is all figured at $7.50 as agreed with the sellers.

The fact that the buyers otherwise owed the company largely more than the full amount of such fund, and that all moneys were credited to the account of that indebtedness, does not affect the duty of the company to the sellers in respect to that situation. Neither is it affected by any collateral agreement between the company and the buyers.

So that, while the agreement with the sellers to pay the bank should fairly be interpreted as a guaranty of the obligation of the buyers, who were the principal debtors to them, and who assumed the primary liability

to the bank, it became the primary duty of the company in so far as the sellers are concerned to the extent that the mill products delivered to the company or to others with its consent were sufficient under the $7.50 per thousand agreement to cover the amount of those debts.

We think that a fair inference from the evidence is that it was sufficient even though the sellers be held to be bound by the modification limiting the amount to $3 per thousand feet on shipments made thereafter.

The court therefore on either aspect correctly rendered judgment for defendants, appellees here.

There are some assignments of error in respect to the admission of testimony. But we need not consider them, since the uncontradicted testimony other than that referred to in these assignments is sufficient to support the finding. Little v. People's Bank, 209 Ala. 620, 96 So. 763; Pope v. Howle, 227 Ala. 154, 149 So. 222; Springer v. Sullivan, 218 Ala. 645, 119 So. 851; First National Bank v. Chaffin, 118 Ala. 246, 24 So. 80.

The judgment of the circuit court is affirmed.

Affirmed.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.

### On Rehearing.

FOSTER, Justice.

Our statement in the opinion is challenged as incorrect when we stated that Paterson & Edey Lumber Company paid the bank and had the notes and mortgage transferred to Mrs. Paterson and Mrs. Edey. This challenge is perhaps well sustained as to the last payment of $10,000 and interest, but not as to the others. The transactions were so complicated, and all conducted by Mr. Paterson, it is difficult to understand exactly to whom he refers when he says that "I" and "we" did or agreed to do certain things.

We will make another effort to understand and explain the details. On page 38 (21) Mr. Paterson, in relating the details of his agreement to pay the bank notes and mortgage, uses the words "I" and "we," without saying for whom he is speaking. We did and do assume that he was speaking for Paterson & Edey Lumber Company. On pages 37 and 38 he says that in December, 1920, Mr. Hall, president of the First National Bank, to whom they were indebted, reminded him that An-

ders owed him (that is, Paterson and Edey Lumber Company) a large debt, and that "your statement" (presumably Paterson & Edey Lumber Company) shows the company owes Paterson and Edey individually large sums; that he wanted "you to take that off and clear it up by making a cross entry"; that this was done. On December 23, 1920 (apparently part of the same transaction), Paterson & Edey Lumber Company, by written instrument, assigned to Mrs. Paterson and Mrs. Edey all the timber and rights in the Anders transaction and its account against Anders—$52,754.38—and the right to pay that account out of the lumber sales, and its rights under the tripartite agreement. It further stipulated that Mrs. Paterson and Mrs. Edey thereby agreed to perform all the covenants and agreements under said contract.

Our understanding of that transaction is that the wives paid no money of their own, but that by entries on the books of Paterson & Edey Lumber Company the debts due Paterson and Edey individually were canceled and the account against Anders transferred to Mrs. Paterson and Mrs. Edey, who assumed the obligations of the tripartite agreement. This was all to satisfy the suggestion of the First National Bank. The tripartite contract stipulated that $7.50 per thousand should be set apart to pay the debts to Davis Bluff Land & Timber Company and the People's Bank. But it had been verbally changed so that Paterson & Edey Lumber Company agreed, as we interpret it, to pay those debts in anticipation of a receipt of sufficient lumber. So that Mrs. Paterson and Mrs. Edey agreed either to the terms of the contract as written or as verbally modified.

We stated in the original opinion that enough lumber was sold under the direction of Mr. Paterson, representing the one and then the other, to be sufficient to reimburse them at the rate of $7.50 per thousand, or as modified at $3 per thousand.

Mr. Paterson says that he borrowed the money and made the final payment to the bank of $10,000 and interest, and then had the mortgage assigned to Mrs. Paterson and Mrs. Edey. It is immaterial whether he was representing them, and thereby enabling them to fulfill their contract, or whether this was an individual transaction of his own. When the notes and mortgage were assigned to Mrs. Paterson and Mrs. Edey, who were under obligation to pay them, and who then or thereafter were reimbursed under the contract by

virtue of the $7.50 per thousand, or the $3 per thousand, contract, the debt thereby became discharged.

Much of the argument for appellant is predicated on the statement that the agreement to set apart $7.50 per thousand, as set out in the tripartite agreement, was abandoned. But it was only modified. As modified, Paterson & Edey Lumber Company agreed to and did pay the debts in anticipation of a receipt of an amount sufficient for that purpose on that basis. But having paid the debt and taken an assignment, it was kept alive only to the extent that an amount equal to it was not computable on the basis of lumber sold.

Mrs. Paterson and Mrs. Edey, in assuming the tripartite agreement, also assumed its modified form. It was all done by their alter ego, Mr. Paterson, who had consented to the modification, and who negotiated the transfer to them and their assumption of the contract. So that it matters not whether Paterson & Edey Lumber Company, J. E. Paterson, individually, or for Mrs. Paterson and Mrs. Edey, supplied the money to pay the bank, when the assignment was made. The debt in the hands of Mrs. Paterson and Mrs. Edey was paid when a sufficient amount of lumber was sold to the Paterson & Edey Lumber Company and Mrs. Paterson and Mrs. Edey, or at their instance, to satisfy the debt at $7.50 per thousand, since Davis Bluff Land & Timber Company was not a party to the change to $3 per thousand.

Application for rehearing overruled.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.